**William H. WORRELL and Wanda Worrell, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. Nos. 64–H–476, 65–H–191.**

United States District Court
S. D. Texas,
Houston Division.

March 25, 1966.

———◆———

Vinson, Elkins, Weems &, Searls, John G. Heard and W. Dalton Tomlin, Houston, Tex., for plaintiffs.

Woodrow Seals, U. S. Atty., Edwin M. Sigel, Asst. U. S. Atty., Tax Div., Houston, Tex., for defendant.

Memorandum and Order:

NOEL, District Judge.

This consolidated action is for the recovery of income taxes and interest paid thereon by the plaintiffs, assessed and collected under the Internal Revenue laws of the United States. The case was tried to the Court, without a jury, and is now ripe for decision.

This Court has jurisdiction under the provisions of 28 U.S.C.A. § 1346(a) (1).

Plaintiffs are husband and wife who filed joint income tax returns for the years 1957, 1958, 1959 and 1960. Plaintiff, Dr. Worrell, is a practicing dentist in Houston, Texas. On their federal income tax returns for the years 1957 through 1960, Dr. Worrell reported certain amounts as fees collected and net income from his dental practice.[1] He also reported farm losses resulting from his operations with regard to (1) cattle rais-

---

1. None of the items connected with the dental practice are in issue here.

ing and breeding, and (2) quarter-horse training and showing, in the following amounts: 1957, $2,171.08; 1958, $3,719.36; 1959, $4,550.60; and 1960, $4,525.38.[2]

Defendant disallowed these claimed losses and assessed a deficiency against plaintiffs. Plaintiffs paid the assessment and filed timely claims for refund which were disallowed. This suit based on those claims was timely instituted.

Briefly, plaintiffs claim that throughout each of the taxable years in question, Dr. Worrell carried on a trade or business of raising, training and showing quarter horses and of operating a farm, which activity was carried on with the intent to make a profit. They claim that Dr. Worrell had every reasonable expectation that the business would be a profitable one and that the losses claimed were proper deductions for the years in question.

Defendant opposes this view. Defendant claims that the activity in question did not constitute a trade or business as that term is used in the Internal Revenue Code of 1954, and that the losses for the years in question were properly disallowed by defendant.

The case turns on a fact determination. The intention of the taxpayer is the dominant factor in determining whether he engaged in a venture merely for pleasure or, conversely, for profit. Farish v. Commissioner, 103 F.2d 63 (5th Cir. 1939); Tatt v. Commissioner, 166 F.2d 697 (5th Cir. 1948). Based on all of the circumstances of this case, I find as a fact that it was taxpayer's intention to engage in a trade or business, as that term is used in Section 162 of the Internal Revenue Code of 1954, in his cutting-horse and farming operations. Therefore, plaintiffs are entitled to a refund of the taxes erroneously assessed against them as a result of the disallowance of the deduction for the losses in these activities.

Dr. Worrell has been interested in horses since his boyhood. He does not participate in such hobbies as golf, fishing or hunting. Prior to 1956, his cutting-horse operation did not amount to a trade or business, since the operations were not undertaken with the reasonable expectation of profit. Prior to 1956, his cutting-horse activities appear to have been his chief source of recreation.

In 1956 Dr. Worrell changed his method with regard to his horse show activities, and beginning in that year he conducted these activities intending to make a profit. Dr. Worrell's anticipated revenues would come from prizes offered in various cutting-horse contests in which he would show his cutting horses. He did not intend to operate a profitable breeding and selling operation. Prize money with regard to cutting-horse contests in 1956 through 1960 ranged from around $200 per event in Dallas, Fort Worth and Houston, to $50 per event in smaller cities in Texas. According to expert testimony, the "better horses" could hope to win between $12,000 to $18,000 in the years 1956 through 1960.

Dr. Worrell consulted with many people concerning his venture for profit before he actually entered business. He talked to cutting-horse and quarter-horse experts. Additionally, Dr. Worrell retained an accountant to set up an accounting system for his farm and quarter-horse operation separate from his dentistry account books.

During 1956 Dr. Worrell made additional capital investments in his horse business. Earlier, he had leased sixty acres of land on Westheimer Road as a training arena for his horses. During 1956 he had lights added to this training area so he could work at night, facilities not available previously. Additionally,

2. The revenues and expenses as reported on Schedule F for each of the tax years in question are as follows:

|  | Revenues | Expenses | Net Loss |
|---|---|---|---|
| 1957 | $2,843.30 | $5,014.38 | $2,171.08 |
| 1958 | 2,410.02 | 6,129.38 | 3,719.36 |
| 1959 | 1,478.08 | 6,028.68 | 4,550.60 |
| 1960 | 823.85 | 5,349.23 | 4,525.38 |

he purchased a ranch at Centerville, Texas. The Centerville property was used both for the cattle operation and for some of the training of the cutting horses, although the majority of the training took place during those years at his Westheimer Road arena on the same sixty acres of land he had leased there. He built a corral on his Centerville acreage in which to train his horses, in 1956. He employed a trainer for a brief period during this time but released him because the expense of the trainer substantially reduced the profit potential of the business.

Dr. Worrell did not and does not have a residence or any entertainment facilities on the property where he conducts his operations. He does no entertaining on the property, using it solely for purposes of training his horses.

Dr. Worrell, who also maintains a successful dentistry practice, devoted at least an average of twenty hours per week to his quarter-horse operation during the years in question. Beginning in 1956, he substantially increased the amount of time he spent working with his horses when he embarked into the business for profit.

Defendant makes several factual contentions which it claims indicate that Dr. Worrell did not intend to enter the cutting-horse and cattle business for the purpose of making a profit. These facts are as follows:

(1) Dr. Worrell's expenses each year with regard to his horse operations amounted to several thousands of dollars. Defendant concludes that at no time during the years in question did the income from the horse shows ever bear any reasonable relationship to horse expenditures.[3]

(2) Additional investment in substantial amounts was not made in an effort to correct the discrepancies between receipts and expenditures.

(3) Dr. Worrell testified that he would sell a horse when he received an offer which he considered exceeded the amount of prize money the horse could win. Dr. Worrell sold a horse, Honey Bee Joe, in 1958 for $3500. Previously, he sold the horse Banjo Eyes in 1957 for $4500.

In determining the intention of the taxpayer, courts have relied upon many factors as outlined by 5 Mertens, Federal Income Taxation, Section 28.73 (rev. ed. 1963). The nature of this business has inherent difficulties insofar as tax considerations may be involved.

"The operation of a racing stable or a breeding farm [is] in its essence a risky business, frequently giving rise to consecutive periods of annual losses. * * * While horseracing is a sport, it may nevertheless constitute a business. The existence of substantial financial risk in the conduct of such business does not necessarily convert it into a hobby any more than in the case of any other adventurous business, such as mining, oil development or trading in securities. All of these businesses involve a substantial risk factor and frequently occasion periods of continued losses." 5 Mertens Sec. 28.74 at 338–339 (rev. ed. 1963).

The foregoing indicates that the nature of the business affects the Court's interpretation of the facts.

In regard to defendant's first contention, that the expenses at all times exceeded the revenues, the case of Farish v. Commissioner, supra, indicates that continued losses in the early stages of a

3.

|  | Prize Money | Expenses |
|---|---|---|
| 1957 | $ 400.57 | $5,014.38 |
| 1958 | 293.17 | 6,129.38 |
| 1959 | 709.92 | 6,028.68 |
| 1960 | 1,160.16 | 5,349.23 |

business which involves the training of animals are not inconsistent with the intention of making a profit. In that case, the expenses incurred by taxpayers in raising polo ponies averaged about $9,100 yearly for the first five years of operation with no revenues for any of those years. However, the Court allowed the deduction of these expenses.

In this case, there is expert testimony that three to five years are necessary to develop properly cutting horses for purposes of entering them in competition. Dr. Worrell testified that he entered his horses in many of the smaller shows, not for the sole purpose of winning admittedly small prizes, but for the primary purpose of training these horses for competition later in larger shows. Dr. Worrell's revenues from winnings were increasing every year whereas his expenses were not increasing on a trend basis. Additionally, viewed on a cash-flow basis, the cash loss was not nearly so great as the tax loss.[4]

With regard to the second contention of defendant, that Dr. Worrell did not make additional investment in substantial amounts, there is no requirement that additional investment in substantial amounts must be made with regard to what, concededly, amounts to a small operation. There was ample testimony that a man of Dr. Worrell's expertise in the field of training cutting horses could reasonably anticipate a profit from his operation as it was conducted in the years in question.

With regard to defendant's third contention, that Dr. Worrell sold Honey Bee Joe for $3500 and Banjo Eyes for $4500, thus indicating that he did not consider that these horses could win more prize money than these amounts, defendant omits to mention the unforeseeable injury to Dr. Worrell's most promising horse, Honey Bee Joe. Dr. Worrell sold Honey Bee Joe for $3500 in 1958, after the horse had sustained an accidental injury—i. e., the horse was struck by a car on Westheimer Avenue—which foreshortened her career. Prior to this accident, Dr. Worrell testified that he refused an offer of $13,000 for her. Thus, the accident substantially diminished the value of Honey Bee Joe, and the sale price of $3500 reflected the loss in her value as a result of this injury. Unforeseeable injuries are a consequence which the Court may consider in its evaluation of all the facts of the case; cf., DuPont v. United States, 234 F.Supp. 681, 686 (D. Del.1964). Expert testimony was to the effect that prior to her injury, Honey Bee Joe potentially was a "top horse" and that top horses during the years in question potentially could win $12,000 to $18,000 per year. Although the test is the good-faith intention of the taxpayer to enter and carry on the operation for

4. The discrepancy between revenues and expenses of Dr. Worrell's business are not so substantial if the "cash flow" is compared to the tax loss. On a cash-flow basis, plaintiffs realized an actual cash profit from the operation of the farm for 1957 in the amount of $1,721.42. On a cash-flow basis, the actual cash losses sustained in the three subsequent years were $1,069.36 for 1958, $4,550.60 for 1959, and $1,087.88 for 1960. These stipulated actual cash figures include an additional source of funds generated by the business but not reflected by Schedule F—i. e., the proceeds from the sale of horses by Dr. Worrell which resulted in capital gains to him. Although Internal Revenue Service requires capital gains to be reported upon a separate schedule, nonetheless, these particular capital gains are an item of Dr. Worrell's cutting-horse business. Thus, the economic result of his operations are as follows:

| | 1. Revenues | 2. Capital Gains | 3. Subtotal (1 + 2) | 4. Expenses | 5. Net Cash Gain (Loss (3 − 4) |
|---|---|---|---|---|---|
| 1957 | $2,843.30 | $3,892.50 | $6,735.80 | $5,014.38 | $1,721.42 |
| 1958 | 2,410.02 | 2,650.00 | 5,060.02 | 6,129.38 | 1,069.36 |
| 1959 | 1,478.08 | –0– | 1,478.08 | 6,028.68 | 4,550.60 |
| 1960 | 823.85 | 3,437.50 | 4,261.35 | 5,349.23 | 1,087.88 |

the purpose of making a profit, and not the reasonableness of the taxpayer's belief that a profit will be realized, Doggett v. Burnet, 62 App.D.C. 103, 65 F.2d 191 (1933), the above factors would seem to indicate that without the injury to Honey Bee Joe, Dr. Worrell reasonably expected to realize a profit from his operation. The sale of the horse in distress circumstances does not alter this Court's finding as to the bona fide intention of Dr. Worrell at the outset of his venture into the business for profit.

Defendant also contends that as a matter of law the expenses incurred in taxpayers' operation are not deductible because they were incurred in connection with gathering assets in anticipation of going into business, citing numerous cases. Defendant argues that in 1957, 1958, 1959 and 1960 taxpayers had not entered into their business, but instead were in the process of gathering together the necessary animals and other assets to go into business in the future. This contention ignores the fact that taxpayers had entered into the chief source of revenue-producing activities in the operation—entering cutting horses in shows to win prize money. Such entries actually resulted in the production of revenues for the years in question. Defendant relies upon cases in which the deductions were disallowed on the ground that the taxpayers as yet was not in business.[5] In all of these cases, the taxpayer had not commenced operations. Such was not the situation of Dr. Worrell, and thus these cases are inapposite to his situation. Defendant cites Richmond Television Corp. v. United States, 345 F.2d 901 (4th Cir. 1965), for this proposition. Richmond states:

"The uniform teaching of these several cases is that, even though a taxpayer has made a firm decision to enter into business and over a considerable period of time spent money in preparation for entering that business, he still has not 'engaged in carrying on any trade or business' within the intendment of section 162(a) *until* such time as the business has begun to function as a going concern and perform those activities for which it was organized." 345 F.2d at 907. (Emphasis added.) (Footnotes omitted.)

In the practical sense of a going trade or business, Dr. Worrell certainly was "in business," Mayrath v. Commissioner, 41.56 P–H T.C. 41 T.C. 582 (1964). Under the concept of Richmond, he was performing the activities for which his business was organized, and generating revenues thereby.

Inasmuch as plaintiff taxpayers are entitled to these deductions and therefore to a refund of federal income taxes collected, in accordance with paragraph (13) of the Pretrial Order in this case, defendant will cause the Internal Revenue Service to compute the amount of the refund to which plaintiffs will be entitled. In the event plaintiffs agree with this computation, plaintiffs will submit promptly the proper form of judgment and a Decree for such amount will be entered. If the plaintiffs disagree with such computation and agreement between plaintiffs and defendant cannot be reached,

---

5. Richmond Television Corp. v. United States, 345 F.2d 901 (4th Cir. 1965); Edward R. Godfrey, 1963 P–H Tax Court Mem. para. 63001, aff'd. 335 F.2d 82 (6th Cir. 1964), cert. denied 379 U.S. 966, 85 S.Ct. 660, 13 L.Ed.2d 560 (1965); John Munroe, 65–2 U.S.T.C. para. 9495 (S.D.N.Y.1965); Edwin H. Miner, 1962 P–H Tax Court Mem. para. 62222. Parenthetically, the Court notes that Dr. Worrell could successfully train only two horses at a time. Dr. Worrell prepared to go into business in the year 1956. In the year 1957, he was carrying on that business under the standards of Godfrey, which sets out as the criteria for determining whether or not a man is carrying on an operation as a trade or business the following:
 (1) He must have a motive and intention of realizing a profit; and
 (2) His activities must be of that type or character which will constitute the present carrying on of a business, rather than those of preparing to enter and carry on a business at some future time.
In 1957, Dr. Worrell had satisfied these standards.

the Court will determine the proper amount of refund and enter judgment accordingly.

The above and foregoing constitutes the Court's findings of fact and conclusions of law in the above matter.

The Clerk shall file this Memorandum and Order, and send a copy thereof to each counsel of record.