PETER HURD and HENRIETTE W. HURD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hurd v. Commissioner
Docket No. 7481-74.
United States Tax Court
T.C. Memo 1978-113; 1978 Tax Ct. Memo LEXIS 401; 37 T.C.M. (CCH) 499; T.C.M. (RIA) 780113; March 22, 1978, Filed *401 (1) Ps, well known professional artists, sustained substantial losses from the operation of their cattle ranch. Held, the ranch operation was not conducted to make a profit; therefore, losses sustained are not deductible. (2) Ps claimed depreciation deductions based on the entire cost of their guest facilities and a room known as the Gallery. The Commissioner attributed 33-1/3 percent of the use of the guest facilities and 50 percent of the use of the Gallery to Ps' art business and disallowed part of the deductions claimed. Held, the Commissioner's determination is sustained. (3) Held, further, Ps failed to prove they are entitled to depreciation deductions for improvements to a greenhouse known as the Orangery. (4) Held, further, Ps are not entitled to deductions for depreciation on rental property in excess of the amounts allowed by the Commissioner. Claude M. Maer, Jr., and John W. Bassett, for the petitioners. Thomas M. Ingoldsby, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in the petitioners' Federal income taxes: Year
Deficiency
1968
$32,350.69
1969
20,451.67
1970
29,467.28
The *402 issues remaining for decision are: (1) Whether the petitioners are entitled to deduct losses incurred in operating their ranch in 1968, 1969, and 1970; (2) whether the petitioners are entitled to deductions for depreciation on their guest facilities and a room known as the Gallery in excess of the amounts allowed by the Commissioner for 1968, 1969, and 1970; (3) whether the petitioners are entitled to a deduction for depreciation on a greenhouse known as the Orangery for 1970; and (4) whether the petitioners are entitled to deductions for depreciation on rental property in excess of the amounts allowed by the Commissioner for 1969 and 1970. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Peter Hurd and Henriette W. Hurd, husband and wife, resided at Sentinel Ranch, San Patricio, N.M., at the time they filed their petition in this case. They filed joint Federal income tax returns for the years 1968, 1969, and 1970. Both Mr. and Mrs. Hurd are highly successful artists. Mr. Hurd is well known for his landscapes of the Southwest. Mrs. Hurd, a member of the famous Wyeth family of artists who paints under her maiden name of Henriette *403 Wyeth, is an acclaimed portrait and still-life artist. During the years at issue, Mr. and Mrs. Hurd's principal source of income was the sale of their paintings. Their gross receipts from their work as artists were $174,088.55 in 1968, $162,830.08 in 1969, and $189,032.14 in 1970. Their adjusted gross income, without consideration of the ranching operation, was $158,421.33 for 1968, $122,902.83 for 1969, and $148,354.12 for 1970. Mr. and Mrs. Hurd were married in 1929, In 1934, they acquired 34 acres of land near San Patricio, N.M., known as the Sentinel Ranch (the ranch). The ranch is located on the Rio Ruidoso in an area known as the Upper Hondo Valley and is approximately 50 miles west of Roswell, N.M. Mr. and Mrs. Hurd moved to the ranch in the late 1930's and resided there continuously from that time until the time of trial. Between 1934 and 1968, they purchased several additional parcels of land; as of December 31, 1968, they owned approximately 2,196 acres. Mr. and Mrs. Hurd purchased an additional 220 acres in 1969, and as of December 31, 1970, they owned approximately 2,416 acres. [1] In terms of acreage, the Hurd ranch was one of the larger ranches in the Upper Hondo Valley. *404 Mr. Hurd, who was born in 1904, was raised on a ranch located on the outskirts of Roswell, N.M. His father developed new types of grass seeds as a hobby, and Mr. Hurd inherited this interest in flora. Mr. Hurd has had a lifelong interest in conservation. He believes that he is merely the "steward" of his land, not the owner, and that he has an obligation to return his land in better condition than when he received it. Mr. Hurd is very knowledgeable in a number of areas related to ranching, including the identification and uses of vegetation and land and water conservation. From 1942 until 1965, Mr. Hurd gave distinguished service as a member of the Board of Supervisors of the Upper Hondo Soil and Water Conservation District (the board). The principal function of the board was to promote and direct conservation within the district. The board was elected by ranchers within *405 the district; the ranchers elected to the board were generally those who were regarded as knowledgeable and were well respected by their neighbors. During his tenure on the board, Mr. Hurd was very active in its affairs. Sometime prior to 1961, Mr. Hurd developed, with the assistance of the Soil Conservation Service of the Department of Agriculture (SCS), a range conservation program for his ranch. Grazing was deferred for 3 years to give weakened grasses an opportunity to build vigor and reseed, thus increasing their density. After the deferral period, the ranch was restocked. The ranch was divided into a number of grazing units, both irrigated and nonirrigated, and the cattle were rotated among the units to prevent overgrazing. As of 1961, Mr. Hurd had 65 head of Angus cattle on his ranch. At that time, he had no desire to acquire any additional land, as he had as much land as he and his ranch hands could manage. The record lacks detailed information about ranching operations before 1965. In 1965, Mr. and Mrs. Hurd hired a new working foreman [2] to manage their ranch; he continued to serve in that capacity throughout the years at issue. [3] In 1970, a ranch hand was hired, and *406 other workers were hired on a temporary basis as needed. The ranch hands performed all of the manual labor on the ranch. However, Mr. Hurd met each morning at 7:00 with his foreman to discuss the ranch operation. He spent the remainder of the morning painting and rode around his ranch in the afternoon with his sketch pad; if he saw a suitable subject for a painting, he stopped to sketch the scene. During his rides, Mr. Hurd also looked over his land and his cattle. When the new foreman arrived in 1965, the cattle operation was in poor condition. The herd had been depleted, and a flood in 1965 had *407 caused considerable damage to the land. From 1965 to 1968, the year-end inventory of cattle gradually increased, and in the opinion of the foreman, the quality of the herd improved. However, in 1969, the size of the herd was reduced drastically, and most of the rangeland was leased to a neighboring rancher. [4]
Mr. and Mrs. Hurd ran what was known as a cow-calf operation; a herd of mother cows was maintained, and calves were produced for sale. They retained the better heifers for their breeding herd and sold the less desirable heifers and steer calves. The herd was comprised of Brangus cattle, which were both marketable and well suited to the area. The cattle inventory from 1968 through 1971 was as follows: Beginning
Ending
1968
Cows
47
53
Heifers
6
6
Calves
4
8
Bulls
3
3
Total
60
70
196 9
Cows
53
13
Heifers
6
6
Calves
8
6
Bulls
3
1
Total
70
26
1970
Cows
13
15
Heifers
6
3
Calves
6
5
Bulls
1
2
Total
26
25
1971
Cows
15
17
Heifers
3
2
Calves
5
3
Bllss
2
2
Total
25
24 In 1969, Mr. and Mrs. Hurd acquired, for a total purchase price of $156,000, 220 acres of land (the Racher and Bonnell ranches) which adjoined Sentinel Ranch. The former *408 owner of the Racher ranch planned to convert it into a resort, with guest facilities and a theater, catering to those with an interest in art. Mr. and Mrs. Hurd were afraid that the guests at the resort would annoy them and interfere with their work as artists. They were strongly opposed to the proposed development; in fact, they considered the prospect "dreadful." Both Mr. and Mrs. Hurd had long admired the Bonnell ranch, and Mr. Hurd had used both the main house and the ranch land in his paintings. Mr. and Mrs. Hurd were afraid the Bonnell ranch might fall into the hands of someone who would not appreciate its beauty. However, Mr. Hurd did consult with his foreman prior to buying the Racher and Bonnel ranches. Immediately prior to the purchase of the Racher and Bonnell ranches, Mr. and Mrs. Hurd had 30.5 acres of pastureland, [5] which was in good condition, [6] and 1,990.0 acres of rangeland. The Bonnell ranch had 28.2 acres of irrigated land, which was in poor condition. The Racher ranch had 32.3 acres of irrigated land, including 13.0 acres of alfalfa. The irrigated land on the Racher ranch was generally in good condition, although reseeding of the pastures was necessary. Mr. *409 and Mrs. Hurd purchased no additional land or water rights subsequent to their acquisition of the Bonnell and Racher ranches. In the summer of 1969, Mr. and Mrs. Hurd requested the SCS to devise a detailed conservation plan for their ranch. The principal objective of the SCS was to assist landowners in the conservation and development of their natural resources, particularly their soil and water resources. Implementation of the recommendations of the SCS normally resulted in a maximization of the productivity of the resources. The SCS prepared a report on Mr. and Mrs. Hurd's ranch, including the recently acquired Racher and Bonnell ranches. The report described the then present and anticipated uses of the ranch land as follows: 2,190 acres
Rangeland
91 acres
Pasture and hay land
16 acres
Orchard
45 acres
Wildlife
17 acres
Recreation
70 acres
Other
2,429 acres
Total [7] *410 Mr. and Mrs. Hurd fully complied with the plan proposed by the SCS. The irrigated pasture on the Bonnell ranch was terraced, leveled, and reseeded. Sixteen acres of orchard also were reseeded into permanent pasture in 1970. The growing of alfalfa proved to be unprofitable, and in 1971, the 13 acres on the Racher ranch previously used for alfalfa were converted to permanent pasture. All of this work was performed *411 by the foreman and ranch hands, including some temporary workers. Throughout this process, Mr. Hurd sought out and followed the advice of experts concerning the proper kinds of grass to plant for pastureage, the proper means of planting such grasses, and the proper fertilizers to use. Mr. Hurd expressed to those he consulted a desire to turn the ranch into a profitable operation. The carrying capacity of land in the Hondo Valley varied according to the availability of water and the type of management. An "animal unit year" is the amount of land required to carry 1 cow with a calf for 12 months. The carrying capacity of dry rangeland varied from 10 to 12 animal units per section of 640 acres. Irrigated pasture varied in its carrying capacity from 1 to 2 animal units per acre. Thus, prior to the acquisition of the Racher and Bonnell ranches, the average carrying capacity of the Hurd ranch was 80 animal units; after 1969, the average carrying capacity was 179 animal units. [8]Mr. and Mrs. Hurd never fully utilized the carrying capacity of their ranch, although at all times relevant to this case, they had enough land available for immediate use to have substantially increased the *412 size of their herd. During the years at issue, Mr. and Mrs. Hurd employed a business manager, *413 whose duties included the maintenance of all books and records of income and expenses of both the ranch and the art profession, paying all bills, receiving visitors to the ranch and making them comfortable, packing and shipping paintings which were sold, collecting for paintings which were sold, handling correspondence, and the maintenance of all files. The business manager kept records of the ranch's income, expenses, and the year-end cattle inventory, and Mr. Hurd was apprised of all income and expenses. However, no records or estimates were prepared showing when the ranch was expected to make a profit or what economic benefit could be anticipated from engaging in a particular activity or acquiring a capital asset. For 1968, the sale of livestock was the sole source of ranch income. For 1969, income was derived from the sale of livestock and from leasing out rangeland. There were no sales of livestock during 1970. The major portion of the ranch's income for such year was derived from leasing out rangeland; there was a small amount of income from the sale of apples. The income, expenses, and losses incurred in the operation of the ranch as shown on the Hurds' income tax returns *414 for 1962 through 1975 were as follows: Year
Income
Expenses
Losses
1962
$ 2,455
$ 18,461
$ 16,006
1963
2,471
19,589
17,118
1964
5,244
22,901
17,657
1965
3,296
19,735
16,439
1966
5,058
21,756
16,698
1967
5,044
23,024
17,980
1968
1,403
20,680
19,277
1969
7,127 a
24,755 b
17,628
1970
3,469
41,098 c
37,629
1971
7,141
33,385
26,244
1972
6,822
30,360
23,538
1973
9,680
28,252
18,572
1974
8,793
25,354
16,561
1975
6,768
29,872
23,104
Total
$74,771
$359,222
$284,451
A neighboring rancher, Mr. Ernest McDaniel, also ran a cow-calf operation. He owned 960 acres of dry rangeland and 32 acres of irrigated pasture; he leased an additional 880 acres of dry land from the National Forest Service. In addition to being smaller than the Hurd ranch, Mr. McDaniel's ranch was more difficult to operate, because his dry rangeland was located 13 miles from his irrigated pasture and his residence. This separation necessitated *415 daily travel over rough roads, with increased fuel costs and wear and tear on equipment, and also made it difficult to transfer livestock from the range to his irrigated land. Mr. McDaniel and his brother performed all of the labor on their ranch. In 1950, after leveling the land and reorganizing their irrigation system, they planted permanent pasture, but they continued to maintain their basic herd during the reseeding process.During the years at issue, Mr. McDaniel and his brother fully utilized their ranch's carrying capacity. The 1965 flood had devastating effects on Mr. McDaniel's ranch. He suffered a heavy loss of livestock, all of his fences and bridges were destroyed, and all of his irrigation dams were swept away. He continued to feel the financial effects of the flood a full 3 years later, due to the heavy loss of breeding stock. Despite these difficulties, Mr. McDaniel made a profit from his cattle operation during each of the years 1965 through 1973. On their Federal income tax returns for 1968, 1969, and 1970, Mr. and Mrs. Hurd deducted the losses sustained in the operation of their ranch. In his notice of deficiency, the Commissioner disallowed such deductions, on *416 the ground that it had not been established that the ranch was operated with the intention of making a profit. Mr. and Mrs. Hurd's residence and associated buildings on the ranch made up what was known as the Compound. The Compound was rectangular in shape and surrounded an open dirt courtyard and parking lot. It consisted of a kitchen, dining room, a bedroom with bath, the master bedroom with bath and an adjacent bath and closet, studios for Mr. and Mrs. Hurd, a guest bedroom with bath, an office for their business manager, a greenhouse which was attached to Mr. Hurd's studio, and a freestanding room known as the Gallery. The buildings were constructed of adobe, and the architecture was Spanish. Peacocks strolled the grounds of the Compound. The Gallery was a separate, freestanding building connected to the rest of the residence by a breezeway. The furnishings in the Gallery included a grand piano, a sofa, and occasional chairs. Bookcases lined some of the walls in this room, and paintings were hung above the bookcases and on the other walls. Additional paintings were displayed by leaning them against the bookcases. Some of the paintings were for sale, whereas others were *417 the Hurds' personal possessions. The Gallery was a warm, attractively furnished room and was the only room on the ranch furnished as a living room, den, or family room. The Gallery was used to entertain the Hurds' friends and customers, although some close friends were entertained in the kitchen.
Mr. and Mrs. Hurd considered the entire cost of the Gallery to be depreciable and claimed a deduction of $912.23 for depreciation on the Gallery on their income tax returns for each of the years at issue. In his notice of deficiency, the Commissioner determined that only 50 percent of the use of the Gallery was related to Mr. and Mrs. Hurd's art business; accordingly, he allowed a depreciation deduction of $456.12 for each of the years 1968, 1969, and 1970. A building near the Compound housed an indoor, heated swimming pool and a large, 2-story greenhouse known as the Orangery. The swimming pool was maintained at 92 degrees and was used primarily by Mrs. Hurd, who swam at the advice of her doctor to help relieve her arthritis. The Orangery contained vines and unusual plants, such as banana plants, orange and lime trees. Blossoms from plants in the Orangery sometimes were used as the *418 subject of Mrs. Hurd's paintings. In 1970, the roof of the Orangery was raised to permit the vines and trees to grow. On their 1970 Federal income tax return, Mr. and Mrs. Hurd deducted depreciation based on the full cost of improvements to the Orangery; the Commissioner disallowed such deduction. [9]
Mr. and Mrs. Hurd also had on their ranch a 17-acre polo field, used for games which were played on Saturday and Sunday afternoons. Mr. Hurd had played polo since 1935 and regularly played in the polo games during the years in issue. Mr. and Mrs. Hurd had at least four horses on their ranch throughout the years at issue; the horses were used in the polo games, by the Hurds' guests and grandchildren, and in the cattle operation. A building known as the Polo House, located adjacent to the polo field, was used by the polo club for postgame social gatherings. Mr. and Mrs. Hurd received no rental income from the polo club for the use of the Polo House. However, from 1967 through 1971, fellow *419 polo players purchased $43,050 worth of paintings from Mr. and Mrs. Hurd. The nearest hotel to the Hurds' ranch was in Lincoln, N.M., some 14 miles from the ranch and was very old. The only other nearby accommodations were in either Ruidoso, 25 miles away, or Roswell, 50 miles away. During the years at issue, Mr. and Mrs. Hurd often had business visitors stay at their ranch for at least one night and, not infrequently, for longer periods. It was particularly important for portrait clients to remain in residence for several days, so that the artist could get to know the subject. In addition to the guest bedroom and bath located within the Compound, Mr. and Mrs. Hurd had three guest houses. One, located just east of the Compound, was known as the Apple House and consisted of a living room, combination kitchen and dining room, one bedroom and a bath. Across the river north of the Compound were two guest houses called the Meigs houses. One of these houses was quite small, consisting of just one bedroom with a bath. The other also had only one bedroom but was much larger. The Hurds' residence was very attractive and compatible with the area. The Compound provided excellent facilities *420 for them to carry on their painting. The petitioners had many visitors to their ranch and entertained extensively during the years at issue. Many of their guests, including overnight guests, were personal friends who had never purchased paintings. Mr. and Mrs. Hurd considered the entire cost of the two large guest houses and the guest bedroom in the Compound to be depreciable. They claimed depreciation deductions for the guest facilities in the amounts of $2,421.53 for 1968, $2,078.80 for 1969, and $1,925.14 for 1970. In his notice of deficiency, the Commissioner determined that only 33-1/3 percent of the use of the guest facilities was attributable to Mr. and Mrs. Hurd's art business. Accordingly, he allowed depreciation deductions of $807.17 for 1968, $692.93 for 1969, and $641.71 for 1970. At the time the Racher and Bonnell ranches were acquired by Mr. and Mrs. Hurd, each was improved with two houses suitable for renting to tenants. Of the $75,000 purchase price of the Racher ranch, Mr. and Mrs. Hurd allocated $12,500 to the large tenant house and $9,500 to the small tenant house; such tenant houses were in poor condition. Mr. and Mrs. Hurd rented out each of the tenant houses *421 on the Racher ranch for $75 per month. Mr. and Mrs. Hurd purchased the Bonnell ranch for $81,000 and allocated $35,000 and $7,500 of the purchase price to the large and small tenant houses, respectively. They rented out the large tenant house for $250 per month and the small tenant house for $40 per month. The allocation of part of the cost of the Racher and Bonnell ranches to the tenant houses was made by Mr. and Mrs. Hurd's accountant, who did not regularly appraise real estate and was not an expert in appraising real estate. He did not inspect the houses but relied on the description of them supplied by the Hurds' business manager. On their Federal income tax returns, Mr. and Mrs. Hurd claimed deductions for depreciation of the tenant houses in the amounts of $627.07 for 1969 and $2,875.00 for 1970. [10] In his notice of deficiency, the Commissioner determined the fair market value of the houses on the Racher and Bonnell ranches by capitalizing each house's monthly rental income at the rate of 1 percent. Using this method of valuation, he determined that each of the houses on the Racher ranch had a fair market value of $7,500.00 and allocated $15,000.00 of the purchase price *422 to the houses. Of the purchase price of the Bonnell ranch, the Commissioner allocated $25,000.00 to the large house and $4,000.00 to the small house. Accordingly, he allowed annual depreciation deductions of $425.00 for 1969 and $1,950.00 for 1970. OPINION Issue 1. Ranch Losses
The first issue we must decide is whether the petitioners are entitled to deduct losses incurred in the operation of their ranch. For the taxable years 1968 and 1969, the deductibility of such losses is governed by the provisions of sections 162, 165, and 212 [11] *424 of the Internal Revenue Code of 1954. [12] For the losses to be deductible under such provisions, the petitioners must establish that the ranching operations were entered into or conducted with the intentionof making a profit. Lamont v. Commissioner,339 F. 2d 377, 380 (2d Cir. 1964), affg. a Memorandum Opinion of this Court; Hirsch v. Commissioner,315 F. 2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; Bolt v. Commissioner,50 T.C. 1007, 1013 (1968); *423 Bessenyey v. Commissioner,45 T.C. 261, 273 (1965), affd. 379 F. 2d 252 (2d Cir. 1967), cert. denied 389 U.S. 931 (1967); Patterson v. United States,459 F. 2d 487, 493 (Ct. Cl. 1972). With respect to the taxable year 1970, we must consider the effect of section 183, [13] *425 which was enacted as section 213 of the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 571, and is effective for taxable years beginning after December 31, 1969. The purpose of section 183 was to create a more objective standard for determining whether a taxpayer was carrying on an activity for the purpose of realizing a profit. S. Rept. 91-552 (1969), 1969-3 C.B. 423, 490; Jasionowski v. Commissioner,66 T.C. 312, 321 (1976); Benz v. Commissioner,63 T.C. 375, 383 (1974). In furtherance of such purpose, the Commissioner has promulgated regulations enumerating nine separate factors to be examined in determining whether the requisite profit motive exists. Sec. 1.183-2(b)(1)-(9), Income Tax Regs. However, the regulations generally are derived from prior case law; thus, in many cases, the factors to be considered will be the same, regardless of whether the taxable years involved are prior or subsequent to December 31, 1969. Jasionowski v. Commissioner,supra;Benz v. Commissioner,supra.The parties have *426 agreed that this is such a case. Thus, for each of the years at issue, the losses from the petitioners' ranching operations are deductible only if the ranch was operated for the purpose of making a profit. [14] *427 The expectation of profit need not be a reasonable one; it is enough if the taxpayer had a bona fide expectation of realizing a profit, regardless of the reasonableness of such expectation. Sec. 1.183-2(a), Income Tax Regs.; King v. United States,545 F. 2d 700, 708 (10th Cir. 1976); Benz v. Commissioner,63 T.C. at 383; Bolt v. Commissioner,50 T.C. at 1013; Bessenyey v. Commissioner,45 T.C. at 274. The taxpayer's intention is a question of fact to be determined according to the circumstances of each case ( Benz v. Commissioner,supra at 382; Sabelis v. Commissioner,37 T.C. 1058, 1062 (1962); Clark, Executor v. Commissioner,24 B.T.A. 1235, 1238 (1931)), and the petitioners have the burden of proving the requisite profit motive ( Hirsch v. Commissioner,315 F. 2d at 738; Sabelis v. Commissioner,supra;White v. Commissioner,23 T.C. 90, 94 (1954), affd. per curiam 227 F. 2d 779 (6th Cir. 1955), cert. denied 351 U.S. 939 (1956)). A record of substantial losses over many years and the fact that the prospects of ever achieving a profitable operation are minimal are important factors indicative of a taxpayer's *428 intent. Sec. 1.183-2(b)(6), Income Tax Regs.; Wiles v. United States,312 F. 2d 574, 576 (10th Cir. 1962); Jasionowski v. Commissioner,66 T.C. at 322; Bessenyey v. Commissioner,45 T.C. at 274; V. H. Monette & Co. v. Commissioner,45 T.C. 15, 47 (1965), affd. per curiam sub nom. Monette v. Commissioner,374 F. 2d 116 (4th Cir. 1967); White v. Commissioner,23 T.C. at 94-95; Thacher v. Lowe,288 F. 994 (S.D. N.Y. 1922). The presence of losses in the initial stages of an activity is not necessarily inconsistent with a profit motive; but since the goal must be to realize a profit on the entire operation, there must be a prospect, not only for earning future profits, but for profits sufficient to offset the losses sustained during the early years of operation. Bessenyey v. Commissioner,supra;Sabelis v. Commissioner,supra at 1062. In the case before us, the petitioners called some very articulate witnesses, and their case was well presented. Nevertheless, when we strip away all the talk, dig out the hard facts, and apply cold logic to them, we are not convinced that the petitioners truly expected to make a profit from the operation of their ranch. In this record, we have information *429 concerning the operation of the ranch for a period of 14 years--1962 through 1975, and in each of those years, the petitioners incurred a substantial loss, ranging from a low of $16,006 in 1962 to a high of $37,629 in 1970. Moreover, the losses generally increased in amount; during the first 4 years, the average loss was $16,805, and during the last 4 years, the average loss was $20,444. For the years at issue--1968, 1969, and 1970, the average loss was $24,845, but that average was increased by the unusually large loss of $37,629 in 1970. A record of such large losses over so many years is persuasive evidence that the petitioners did not expect to make a profit ( sec. 1.183-2(b)(6), Income Tax Regs.; Wiles v. United States,312 F. 2d at 576), and in this case, there is no reason to believe that the trend will change. To be sure, the petitioners would have been happier if the ranch operations produced a profit. Their income from their art work enabled them to absorb substantial losses from the ranch operations; yet, they were not indifferent to the amount of such losses; they kept in touch with the expenses of operating the ranch; and from time to time, they took actions to reduce *430 those expenses. However, they never made a sincere effort to make the ranch profitable. The carrying capacity of the ranch, at all times, exceeded the number of cattle which were in fact carried thereon. Before the acquisition of the Racher and Bonnell ranches, the carrying capacity was 80 animal units; yet, the largest number of adult animals [15] owned by the petitioners during those years was 62, and by the end of 1969, the herd had been reduced to 20 adult animals. After the acquisition of the Racher and Bonnell ranches, the carrying capacity was increased to 179 animal units, but the petitioners never carried more than 21 adult animals on the ranch. The failure to use the ranch to its maximum capacity cannot be explained as merely a mistake in judgment by the petitioners, in light of Mr. Hurd's background and knowledge of ranching. Mr. Hurd was born in Roswell, N. M., and grew up in that area. He and his wife had resided at their ranch since the late 1930's. Mr. Hurd, through his conservation work, had frequent contact with other ranchers and was familiar with and knowledgeable about ranching operations *431 in the Upper Hondo Valley. In addition, he had available to him the advice of many experts in the field. Had he truly desired to operate his ranch at a profit, it must have been obvious to him and his advisors that the number of cattle carried on the ranch should be increased substantially. In reaching our conclusion in this case, we have also considered the fact that the petitioners had substantial income from other sources and could afford to absorb continued losses from the ranch. Sec. 1.183-2(b)(8), Income Tax Regs.; Jasionowski v. Commissioner,66 T.C. at 322. The petitioners' ranch had social and recreational advantages for them. Sec. 1.183-2(b)(9), Income Tax Regs. ; compare Babbitt v. Commissioner,23 T.C. 850, 866 (1955); Crane, Executrix v. Commissioner,9 B.T.A. 437, 440 (1927). They had a 17-acre polo field, with an adjacent building used exclusively for social gatherings. They maintained horses that were used for the polo games and for pleasure riding, as well as for ranch work. They had ample facilities for overnight guests, and during the years at issue, they had many visitors to the ranch and entertained frequently. We believe that the pleasure derived from *432 these social and recreational activities in part explains why the petitioners were willing to continue operating their ranch in the face of substantial annual losses. In his testimony, Mr. McDaniel put his finger on the difference between his operation and that of the petitioners when he indicated that he operated at a profit because it was his only source of income. The petitioners maintain that they had a longstanding desire to operate the ranch at a profit but concede that prior to 1965, their ranch was not operated in an efficient and businesslike manner. However, they argue that in 1965 they began a concerted effort to turn the ranch into a profitable operation, and that throughout the years at issue, the ranch was operated on an efficient, businesslike, and progressive basis. See sec. 1.183-2(b)(1), Income Tax Regs. We are not convinced by their argument. The petitioners argue that the hiring of a new ranch foreman, the purchase of the Bonnell and Racher ranches, and the implementation of the SCS recommendations were part of a comprehensive plan intended to increase the carrying capacity of their ranch and convert it into a profitable operation. The new foreman was hired *433 in 1965, and we recognize that the employment of competent personnel may be indicative of a profit motive. Sec. 1.183-2(b)(3), Income Tax Regs.; Patterson v. United States,459 F. 2d at 493. From the record, it does appear that the new foreman was knowledgeable about ranching operations. However, the employment of such foreman is not sufficient to establish a significant change in the method of operating the ranch. Since Mr. Hurd could not be expected to conduct the cattle operations himself, someone had to be employed to perform that work, and before 1965, another individual had been employed in a similar capacity. It is clear that the 1969 purchases of the Bonnell and Racher ranches increased the carrying capacity of the petitioners' ranch, but it is not clear that such properties were acquired for that purpose or to make a profit.The Bonnell ranch had been the subject of some of Mr. Hurd's paintings, and both petitioners admired its beauty. Mrs. Hurd testified that the petitioners had wanted for some time to buy the Bonnell ranch and that they were afraid it might fall into the hands of someone who would not appreciate its beauty. With respect to the purchase of the Racher *434 ranch, the evidence of personal motivation is even greater. The former owner of the Racher ranch planned to convert it into a resort, a prospect which the petitioners found "dreadful." Moreover, in evaluating the significance of the acquisition of these two properties, we are mindful of the fact that the petitioners had failed to utilize fully the carrying capacity of the land which they already owned. Under these circumstances, we simply are not persuaded that the petitioners purchased the Bonnell and Racher ranches because of a desire to increase the carrying capacity of their ranch, or that such purchases are indicative of an intent to realize a profit from their ranching operation. Compare Worrell v. United States,254 F. Supp. 992, 993-994 (S.D. Tex. 1966); Wright v. United States,249 F. Supp. 508, 513 (D. Nev. 1965).Rather, such purchases appear to have been made by the petitioners to ward off what they perceived as potential threats to the quality of their environment. We reach a similar conclusion with respect to implementation of the plan proposed by the SCS. The petitioners argue that the fact that Mr. Hurd sought out and followed the advice of experts as to how to *435 improve his land indicates that they intended to realize a profit from their ranching operations. Sec. 1.183-2(b)(2), Income Tax Regs.; Babbitt v. Commissioner, 23 T.C at 867; Patterson v. United States,459 F. 2d at 494; Worrell v. United States,supra at 993. However, Mr. Hurd had a lifelong interest in conservation; indeed, many years earlier, he had requested the assistance of the SCS in devising a plan of conservation for his ranch, and at that time, he also followed their suggestions. Thus, the activities undertaken by the petitioners in 1969 with respect to leveling, terracing, and reseeding parts of their ranch was not a change in their method of operation. In evaluating the significance of such activities, we must consider Mr. Hurd's particular philosophy about the land, which his wife explained at the trial: [16] *436 His basic concept of the land is that it is a miraculous thing created by a superior force, perhaps' a God. Probably a God. And that we on earth have brief tenancy of it, very, very brief and that we must take care of it as much as possible while we are alive. It is true that Mr. Hurd wanted to convert his land to its highest and best use and that the efforts undertaken to achieve such goal also increased the carrying capacity of his ranch. However, we are not satisfied that the reason for such efforts was a desire to increase the ranch's potential profitability, since the petitioners never made full use of the increased carrying capacity. Rather, we believe that such efforts were undertaken because of Mr. Hurd's love of the land and because of the personal satisfaction he derived from improving his land. Benz v. Commissioner,63 T.C. at 385; Bessenyey v. Commissioner,45 T.C. at 275; White v. Commissioner,23 T.C. at 95. The petitioners have pointed to numerous other factors which they argue indicate that they expected to realize a profit from the operation of their ranch: They employed a business manager who kept accurate records of income and expenses. Sec. 1.183-2(b)(1), Income Tax Regs.; Patterson v. United States,459 F. 2d at 493; Worrell v. United States,254 F. Supp. at 993. Mr. Hurd exhibited a personal interest in the ranch, meeting with his *437 foreman each morning to discuss ranch operations and looking at his land and cattle each afternoon. Sec. 1.183-2(b)(3), Income Tax Regs.; Worrell v. United States,supra.They abandoned their apple orchard and the raising of alfalfa when these activities proved to be unprofitable. Patterson v. United States,supra;Babbitt v. Commissioner,23 T.C. at 867. Mr. Hurd expressed to others a desire to make a profit. Field v. Commissioner,26 B.T.A. 116, 123 (1932), affd. 67 F. 2d 876 (2d Cir. 1933); Clark,Executor v. Commissioner,24 B.T.A. at 1238-1239. Admittedly, the petitioners' ranch operation had many of "the trappings of a business." Bessenyey v. Commissioner,45 T.C. at 274. However, these circumstances merely indicate that Mr. Hurd was aware of the income and expenses of the ranch, that he had an interest in such operations, and that they eliminated a minor activity which was unprofitable. Such circumstances are clearly insufficient to outweigh the other factors which have led us to conclude that the ranch was not operated for profit. The petitioners attempt to explain their failure to carry more cattle on the ranch by arguing that they were attempting to build up their *438 herd gradually by the natural increase method, that is, by retaining the best heifers for their breeding herd. There was credible testimony at the trial to the effect that building a herd slowly via the natural increase method produces better results than purchasing large numbers of cattle with unknown bloodlines, and we recognize that the process of building up a breeding herd may take several years. Indeed, the size of the herd did increases from 1965 through 1968, and in the opinion of the ranch foreman, its quality also improved. However, in 1969, the size of the herd was reduced drastically. The petitioners advanced two explanations for the 1969 reduction in cattle. They argued that due to severe drought and the high cost of supplemental feed in 1969 and 1970, they reduced the size of their herd in an attempt to lower their operating costs. They also argued that it was necessary to reduce the size of the herd so that the foreman and ranch hand could complete the work of leveling, terracing, and reseeding. However, Mr. McDaniel testified that the year 1970 was only "moderately dry," and there is no evidence in the record of severe drought in 1969. Mr. McDaniel continued *439 to maintain his herd and make a profit during such years. Moreover, he testified that although he and his brother performed all of the work of leveling, terracing, and reseeding their ranch themselves, they continued to maintain their basic herd throughout this process. Indeed, we find it difficult to understand why the petitioners drastically reduced the size of their herd at the same time that they substantially increased their carrying capacity, particularly when in the opinion of the ranch foreman the quality of the herd had improved over the previous 4 years. To us, it seems that if the petitioners really wanted to increase the size of their herd so as to make a profit on the ranch, they would have employed additional part-time ranch hands, if necessary, to take care of the cattle and to complete the work of leveling, terracing, and reseeding. In view of the petitioners' large losses on the ranch prior to 1968, their inability to reduce expenses, and their failure to utilize the ranch's carrying capacity, we do not believe that the petitioners, with their knowledge of ranching, had a bona fide expectation of earning enough income from their ranch to meet their annual expenses *440 and recoup their prior losses. Accordingly, the losses incurred are not deductible. Issue 2. Depreciation - Guest Houses and Gallery
Section 167 permits a deduction for depreciation of property used in a trade or business or for the production of income. If property has both business and personal uses, an allocation must be made based on the percentage of business and personal use, for the deduction is limited to the depreciation attributable to the business use of the property. International Artists, Ltd. v. Commissioner,55 T.C. 94, 105 (1970); Bussabarger v. Commissioner,52 T.C. 819, 829 (1969); Sapp v. Commissioner,36 T.C. 852, 854-855 (1961), affd. per curiam 309 F. 2d 143 (5th Cir. 1962); Heuer v. Commissioner,32 T.C. 947, 953 (1959), affd. per curiam 283 F. 2d 865 (5th Cir. 1960). On their income tax returns for the years at issue, the petitioners claimed depreciation deductions based on the entire cost of the Gallery, the two large guest houses, and the guest bedroom in the Compound. In his notice of deficiency, the Commissioner made adjustments to the depreciation deductions based upon his determination of 50 percent business use for the Gallery and 33-1/3 percent *441 business use for the guest facilities. [17] The evidence at the trial showed that a substantial number of the persons entertained were personal friends rather than business associates; thus, the petitioners clearly are not entitled to depreciation deductions based upon 100 percent business use of the Gallery and the guest facilities. The petitioners have the burden of proving the percentage of business use. Heuer v. Commissioner,supra.The record will not support their contention of 100 percent business use, and they have not come forward with sufficient evidence to establish what percent of the total use of these facilities was for business purposes. Accordingly, we must sustain the Commissioner's determination. Issue 3. Depreciation - The Orangery
For 1970, the petitioners claimed a depreciation deduction based upon the entire cost of remodeling the Orangery. The remodeling consisted of raising the roof to give the trees and vines more *442 room to grow. At the trial, there was testimony that blossoms produced in the Orangery were sometimes used in Mrs. Hurd's paintings. However, there was nothing to indicate that the blossoms used by her were produced by the particular trees and vines which needed additional height, necessitating the improvements at issue. Without evidence connecting her work to such trees and vines, we cannot find that the Orangery was property used solely in Mrs. Hurd's art business, and we are unable to speculate as to what percentage of the remodeling cost is attributable to her art business. Accordingly, the Commissioner's determination is sustained. Issue 4. Depreciation - Rental Properties
For purposes of the depreciation deduction, where improvements and land are purchased for a lump sum, the basis or cost must be allocated between the depreciable and nondepreciable property according to their respective fair market values at the time of acquisition. Secs. 1.167(a)-2 and -5, Income Tax Regs. The petitioners allocated $12,500 of the purchase price of the Racher ranch to the large tenant house and $9,500 to the small tenant house. Of the purchase price of the Bonnell ranch, they allocated *443 $35,000 to the large tenant house and $7,500 to the small tenant house. In his notice of deficiency, the Commissioner made a reallocation; he determined the fair market value of the tenant houses by using a "rule of thumb" under which he capitalized each house's gross monthly rental income at the rate of 1 percent. In the absence of other persuasive evidence of value, a capitalization of rentals has been approved by this Court. E.g., Honigman v. Commissioner,55 T.C. 1067, 1077 (1971), affd. on this issue 466 F. 2d 69 (6th Cir. 1972); Harriet M. Bryant Trust v. Commissioner,11 T.C. 374, 381 (1948). Unfortunately, the "rule of thumb" utilized by the Commissioner in this case exhibited none of the refinements usually associated with such method. However, the petitioners have the burden of proof on this issue (Rule 142(a), Tax Court Rules of Practice and Procedure), and in the absence of evidence sufficient to carry such burden, we must sustain the Commissioner. The values claimed on the petitioners' income tax returns were determined by their accountant, who was not a real estate appraiser or expert in this field. He did not inspect the properties, but rather relied upon a description *444 of them provided by the petitioners' business manager. Under the circumstances, we can attach little weight to his determination. Although one of the witnesses called by the petitioners was an accredited rural real estate appraiser, he testified only as to the ranch loss issue. On cross-examination, he testified that he did not know the selling price of the Racher or Bonnell ranches, or the cost of any of the specific improvements on either ranch. The petitioners simply have failed to come forward with evidence sufficient to support the values ascribed by them to the tenant houses; accordingly, we must uphold the Commissioner's determination. To reflect concessions by the parties, Decision will be entered under Rule 155. Footnotes
1. The Commissioner has asked us to find that the petitioners purchased an additional 260 acres in 1969, and there is some evidence in the record to suggest that such figure is correct. However, the parties stipulated that the 1969 purchase consisted of 220 acres, and we have based our findings on the stipulation.↩
2. Another individual had served in that capacity prior to 1965. ↩
3. The Commissioner objected to the petitioners' characterization of this individual as a "foreman." The Commissioner pointed out that a foreman generally is defined as an individual in charge of a group of workers; as the individual in question was the only worker on the ranch until 1970, the Commissioner argued that he should properly be characterized as a ranch hand rather than a foreman. The petitioners and their witnesses consistently referred to this individual as the foreman, and for convenience, we will do likewise.↩
4. In 1969, Mr. and Mrs. Hurd sold 46 cows for a gross sales price of $7,875, realizing a gain of $3,275 on the sales.↩
5. Mr. and Mrs. Hurd also had 16.0 acres of irrigated orchard and a 17-acre polo field served by a well. ↩
6. The damage caused by the 1965 flood had by this time been repaired.↩
7. This figure is at variance with the parties' stipulation that Mr. and Mrs. Hurd owned a total of 2,416 acres at the end of 1969. This discrepancy is not explained in the record. However, the parties agreed that, after the purchase of the Racher and Bonnell ranches, Mr. and Mrs. Hurd owned 2,190 acres of dry rangeland and 107 acres which were subject to irrigation. The method used by the parties to compute the number of acres of dry rangeland is not clear. The parties agreed that prior to the purchase of the Racher and Bonnell ranches, Mr. and Mrs. Hurd had 1,990 acres of dry rangeland. Of the 220 acres purchased in 1969, approximately 60 acres were subject to irrigation, leaving a maximum of 160 acres of dry rangeland. When we add this figure to the pre-1969 total of 1,990 acres of dry rangeland, we arrive at a total of 2,150 acres, as opposed to the parties' figure of 2,190. This discrepancy likewise is not explained in the record.
8. In computing the average carrying capacity, we have assumed that the dry rangeland could carry an average of 11 animal units per section and that irrigated pastureland could carry 1.5 animal units per acre. Our calculation of the pre-1969 carrying capacity was based upon our finding that there were 30.5 acres of irrigated pasture and 1,990 acres (3.11 sections) of dry rangeland. Our calculation of the post-1969 carrying capacity was based upon our finding that there were 2,190 acres (or 3.42 sections) of dry rangeland and 94 acres of irrigated land which had been converted to permanent pasture. In our calculations, we have not included the 17 acres used as a polo field because we were not convinced that there was sufficient water available to convert it to pasture. In computing the number of acres of permanent pasture after 1969, we have included 16 acres of orchard land which was seeded in 1970; however, at the petitioners' request, we have excluded 13 acres of irrigated land used to raise alfalfa, because such land was not converted to permanent pasture until sometime after the years at issue.↩
a. Includes gain realized on the sale of 46 breeding cows. See n. 4, supra↩. b. Includes depreciation of $627.07 on the tenant houses on the Racher and Bonnell ranches. See n.10, infra↩. c. Includes depreciation of $2,875.00 on the tenant houses on the Racher and Bonnell ranches and $106.00 on a greenhouse known as the Orangery. See nn. 9 & 10, infra↩.
9. The Orangery was listed on the ranch depreciation schedule. The petitioners now claim that the depreciation deduction for the Orangery is properly attributable to Mrs. Hurd's profession as an artist.↩
10. The tenant houses were listed on the ranch depreciation schedule. However, the Commissioner determined that these rental properties were depreciable regardless of whether the ranch losses were deductible.↩
11. The relevant provisions of such sections are: SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * * SEC. 165. LOSSES. (a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * *
(c) Limitation on Losses of Individuals.--In the case of an individual, the deduction under subsection (a) shall be limited to-- (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; * * * SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year-- (1) for the production or collection of income; ↩
12. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years at issue, unless otherwise indicated. ↩
13. Sec. 183 provides in relevant part: (a) General Rule.--In the case of an activity engaged in by an individual * * * if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) Deductions Allowable.--In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed-- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). (c) Activity Not Engaged in for Profit Defined.--For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212↩.
14. The deductibility of the ranch losses for 1971 was the subject of refund litigation in the U.S. District Court for the District of New Mexico. The only issue submitted to the jury in the refund suit was whether the petitioners were engaged in the trade or business of ranching in 1971. After a trial on this issue, the jury returned a general verdict in favor of the Government. At the time of the trial of the case before us, no judgment had been entered in the refund litigation. Therefore, on brief, the Commissioner conceded that the doctrine of collateral estoppel was not applicable, but argued that in order to prevail, the petitioners were required to come forward with evidence to distinguish 1971 from the years before us.' We reject the Commissioner's argument because it in effect relies upon collateral estoppel, which clearly is not applicable in the case before us. Trapp v. United States,177 F. 2d 1, 5 (10th Cir. 1949); 1B J. Moore, Federal Practice, par. 0.444[1], [4] (2d ed. 1974); see also Shiosaki v. Commissioner,61 T.C. 861↩ (1974).
15. For this purpose, we are including cows, bulls, and heifers as adult animals.↩
16. Counsel for the petitioners explained to the Court why Mr. Hurd did not appear as a witness, and based on that explanation, the Court was satisfied that Mr. Hurd was unable to appear.
17. The Commissioner has not argued that the guest houses were entertainment facilities within the meaning of sec. 274(a), subject to the further requirements of that section and the regulations thereunder. Accordingly, we do not reach this issue.↩